19-1698
United States v. Sindzingre

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 19-1698

UNITED STATES OF AMERICA,
Appellee,

v.

MURIEL BESCOND,
Defendant-Appellant,

DANIELLE SINDZINGRE,
Defendant.

ARGUED: SEPTEMBER 3, 2020
DECIDED: AUGUST 5, 2021
AMENDED: FEBRUARY 3, 2022

Before:     LIVINGSTON, Chief Judge, WALKER, JACOBS, Circuit Judges.[*]

Muriel Bescond, a citizen and resident of France, is charged with violating

the Commodity Exchange Act ("CEA").  She appeals from the memorandum and

order of the United States District Court for the Eastern District of New York

---

[*] This amended opinion and amended dissent supersede the opinion and dissent
decided on August 5, 2021.  The motion for panel rehearing is otherwise denied.

(Seybert, J.), which applied the fugitive disentitlement doctrine and denied her motions to dismiss the indictment on grounds of (inter alia) extraterritoriality and due process. On appeal, Bescond argues that the collateral order doctrine confers appellate jurisdiction to review the application of the fugitive disentitlement doctrine, and that there is pendent appellate jurisdiction to review the merits of her challenges based on extraterritoriality and due process. As to merits, she argues that the district court misapplied the fugitive disentitlement doctrine, that the indictment impermissibly charges her with extraterritorial violations of the CEA, and that her prosecution is inconsistent with due process. We conclude that we have jurisdiction to review the disentitlement ruling, but none to review the merits of extraterritoriality or due process. We conclude that Bescond is not a fugitive and, even if she were a fugitive, the district court abused its discretion in disentitling her. Accordingly, we **REVERSE** the order disentitling Bescond and **REMAND** for further proceedings to consider or reconsider the merits of her motions to dismiss, and we **DISMISS** this appeal insofar as it seeks review of the (alternative) rulings on extraterritoriality and due process.

Chief Judge Livingston dissents in a separate opinion.

2

_____

JEREMY R. SANDERS, Appellate Counsel (David C. James, Alixandra Smith, Andrey Spektor, Assistant United States Attorneys, for JACQUELYN M. KASULIS, Acting United States Attorney for the Eastern District of New York; Carol L. Sipperly, Senior Litigation Counsel; Timothy A. Duree, Trial Attorney; Brian A. Benczkowski, Assistant Attorney General; John P. Cronan, Deputy Assistant Attorney General; on the brief), Washington, DC and Brooklyn, NY, for Appellee United States of America.

LAURENCE S. SHTASEL, Blank Rome LLP, New York, NY, for Defendant-Appellant Muriel Bescond.

DENNIS JACOBS, Circuit Judge:

Muriel Bescond, a French banker, is charged with transmitting false, misleading, and knowingly inaccurate commodities reports, and with conspiracy to do the same, in violation of the Commodity Exchange Act ("CEA"). A citizen and resident of France, she allegedly participated in the LIBOR benchmark interest rate calculation process from her office in Paris. It is alleged that, by causing an artificial reduction in LIBOR rates, she affected the pricing of futures contracts traded on the Chicago Mercantile Exchange. Bescond remains in France today and has not submitted to the district court's jurisdiction.

3

Through counsel, Bescond moved to dismiss the indictment on the grounds that (1) it impermissibly charged her with extraterritorial violations of the CEA, (2) the prosecution violated her Fifth Amendment due process rights, (3) the government selectively prosecuted her because she is a woman, and (4) the statute of limitations had run. The United States District Court for the Eastern District of New York (Seybert, J.) concluded that Bescond was a fugitive, exercised discretion to apply the fugitive disentitlement doctrine, and declined to decide the merits of her motions. Under the doctrine of fugitive disentitlement, a court may decline to entertain the claims of a defendant who is a fugitive from justice. Molinaro v. New Jersey, 396 U.S. 365, 366 (1970) (per curiam); Nen Di Wu v. Holder, 646 F.3d 133, 135 & n.2 (2d Cir. 2011).

In the alternative, the district court rejected the extraterritoriality and due process challenges on the merits. Since additional briefing would have been needed to decide the claims of selective prosecution and statute of limitations, the court did not reach them, even hypothetically.

Because Bescond appeals from a memorandum and order issued pre-trial, we must first ascertain appellate jurisdiction. Bescond contends (i) that the collateral order doctrine affords jurisdiction to entertain the challenge to her

4

designation as a fugitive and the exercise of discretion to disentitle her, and (ii) that there is pendent appellate jurisdiction to decide whether the indictment impermissibly charges extraterritorial violations of the CEA and whether the prosecution violates her due process rights.  We conclude that we have jurisdiction to review the order disentitling Bescond, which we reverse, and we remand for further proceedings to consider or reconsider the merits of her motions to dismiss.  However, we conclude that we lack jurisdiction to review the merits of the extraterritoriality and due process challenges and dismiss the appeal to that extent.

## BACKGROUND

Muriel Bescond is a French citizen living in France who worked as the head of the Paris treasury desk at Société Générale ("SocGen"), a global bank headquartered in France.  The indictment charges that, between May 2010 and October 2011, she participated in a scheme to manipulate the United States Dollar London Interbank Offered Rate ("USD LIBOR").

LIBOR is a benchmark interest rate, calculated for various currencies and borrowing periods, that averages the rates at which certain banks borrow

unsecured funds.  At the time of the alleged scheme, the USD LIBOR calculation process began with sixteen "Contributor Panel" banks submitting estimates of the rates at which they could borrow funds.  SocGen, one of the sixteen, employed "submitters" or "setters" to prepare these estimates and transmit them to Thomson Reuters in London.  Thomson Reuters set aside the four highest estimates and the four lowest, and averaged the eight estimates in the middle to arrive at the final USD LIBOR, or the "fix."  The final rate was transmitted to three data centers for worldwide publication, including one center in Hauppauge, New York.

The prices of certain financial instruments depend on USD LIBOR.  One such instrument is the Eurodollar futures contract, the price of which reflects the predicted USD LIBOR at the end of a fixed period.  Investors trade Eurodollar futures contracts as a commodity on the Chicago Mercantile Exchange.[1]

In Paris, Bescond supervised SocGen's setters.  At the direction of the bank's Global Head of Treasury Danielle Sindzingre, Bescond instructed the

---

[1] Eurodollars are interest-yielding U.S. dollars deposited in foreign banks for fixed amounts of time.  Eurodollar futures contracts are derivatives whose prices reflect the predicted USD LIBOR at the end of the three-month term of a $1 million deposit.  Investors trade Eurodollar futures contracts based on their predictions of USD LIBOR increases and decreases.

setters to prepare false USD LIBOR submissions that were lower than SocGen's actual borrowing rates. The object was to protect SocGen's reputation as a sound financial institution by understating the rates at which SocGen could borrow money. The setters transmitted the false USD LIBOR submissions to a SocGen manager in London, who transmitted them in turn to Thomson Reuters. SocGen's false submissions artificially lowered the USD LIBOR fix, affecting financial transactions that referenced USD LIBOR.

The indictment filed in the Eastern District of New York charged Bescond with four substantive counts of transmitting false, misleading, and knowingly inaccurate commodities reports in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), and one count of conspiracy to do the same. Bescond remains in France and has not submitted to the district court's jurisdiction. France will not extradite her.

Through counsel, Bescond moved to dismiss the indictment. Her first motion argued that the indictment violated the Fifth Amendment right to due process because it failed to allege a sufficient nexus with the United States, and that the statute of limitations had run. Her second motion argued that the government was selectively prosecuting women participants in the alleged

7

scheme, while declining to prosecute men who were similarly situated.  At the district court's request, Bescond filed an additional brief arguing that the indictment charged an impermissible extraterritorial application of the CEA. Bescond also argued that, as an alternative to dismissal on grounds of selective prosecution and statute of limitations, the court should order discovery and additional briefing from the government on those issues.

The district court concluded that Bescond was a fugitive and made the discretionary ruling that disentitlement was warranted.  Accordingly, the court declined to reach the merits of Bescond's motions.  The court then issued an alternative ruling on the merits, in order "to provide the Second Circuit with a complete record on review."  United States v. Sindzingre, No. 17-CR-0464(JS), 2019 WL 2290494, at *9 (E.D.N.Y. May 29, 2019).  It concluded that the indictment properly charged domestic violations of the CEA and that the prosecution did not violate Bescond's due process rights.  The court declined to make an alternative ruling on selective prosecution and the statute of limitations because "additional briefing and information" would be needed to resolve those issues. Id.  Bescond's motions to dismiss were denied in a memorandum and order.

Bescond has appealed. The government moved to dismiss the appeal on the ground that we lack jurisdiction for want of a final judgment. A motions panel of this Court denied the motion, citing the collateral order doctrine.

On appeal, Bescond argues that, as the motions panel concluded, there is appellate jurisdiction to review the disentitlement ruling under the collateral order doctrine; and that we should exercise pendent appellate jurisdiction to review the alternative rulings on the merits of extraterritoriality and due process (Point I below). She argues that the district court erred in designating her a fugitive and in exercising discretion to disentitle her (Point II). Finally, she argues that the indictment charges an impermissible extraterritorial application of the CEA and violates her due process rights (which we cannot decide for lack of jurisdiction).

**DISCUSSION**

**I**

Courts of appeals "have jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Known as the "final judgment rule," section 1291 "requires 'that a party must ordinarily raise all

9

claims of error in a single appeal following final judgment on the merits.'"

Flanagan v. United States, 465 U.S. 259, 263 (1984) (quoting Firestone Tire &

Rubber Co. v. Risjord, 449 U.S. 368, 374 (1981)). In a criminal case, the final

judgment rule "prohibits appellate review until conviction and imposition of

sentence." Id. (citing Berman v. United States, 302 U.S. 211, 212 (1937)). The rule

"minimiz[es] appellate-court interference with the numerous decisions [trial

judges] must make in the pre-judgment stages of litigation[,] . . . reduces the

ability of litigants to harass opponents and to clog the courts through a

succession of costly and time-consuming appeals[, and] is crucial to the efficient

administration of justice." Id. at 263–64 (citing Firestone Tire, 449 U.S. at 374).

Because these interests "are 'especially compelling in the administration of

criminal justice,'" the policy underlying the final judgment rule "is at its

strongest in the field of criminal law." Id. at 264 (first quoting Cobbledick v.

United States, 309 U.S. 323, 325 (1940), and then quoting United States v.

Hollywood Motor Car Co., 458 U.S. 263, 265 (1982)).

Nevertheless, in limited circumstances, a court of appeals may exercise

jurisdiction absent a final judgment on the merits. Under the collateral order

doctrine, a court of appeals has jurisdiction to review an order that (1)

"conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and (3) is "effectively unreviewable on appeal from a final judgment." Id. at 265 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978), superseded on other grounds by Fed. R. Civ. P. 23(f)); see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949).[2] We apply the collateral order doctrine "with the utmost strictness in criminal cases." Flanagan, 465 U.S. at 265.

Relatedly, we may exercise pendent appellate jurisdiction in certain interlocutory appeals. When we have jurisdiction to review "'an interlocutory appeal of one ruling,'" we may also "exercise jurisdiction over other, otherwise unappealable interlocutory decisions, where such rulings are 'inextricably intertwined' with the order over which we properly have appellate jurisdiction, or where review of such rulings is 'necessary to ensure meaningful review' of the appealable order." Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98, 116–17 (2d Cir. 2016) (quoting Myers v. Hertz Corp., 624 F.3d 537, 552 (2d Cir. 2010)).

---

[2] This case does not implicate the various statutory exceptions to the final judgment rule. See, e.g., 28 U.S.C. § 1292 (permitting appellate review of certain interlocutory decisions).

11

We agree with Bescond that we have jurisdiction to review the fugitive disentitlement ruling pursuant to the collateral order doctrine; we disagree that we have pendent jurisdiction to review the alternative rulings concerning extraterritoriality and due process.

**A.  The collateral order doctrine**

A motions panel has already decided that the collateral order doctrine affords appellate jurisdiction to review the disentitlement order in this case. Upon our own independent review, we hold that we have jurisdiction under the collateral order doctrine to review an order disentitling a foreign citizen who has remained at home abroad—in this case, without evasion, stealth, or concealment.

1.    Conclusive determination

It is undisputed (including by the dissent for purposes of this appeal) that the disentitlement ruling satisfies the first requirement of the collateral order doctrine: it "conclusively determine[s] the disputed question." Flanagan, 465 U.S. at 265 (quoting Coopers & Lybrand, 437 U.S. at 468).

2. <u>An important issue separate from the merits</u>

Disentitlement is "important"—that is, it is "weightier than the societal interests advanced by the ordinary operation of final judgment principles." <u>Digit. Equip. Corp. v. Desktop Direct, Inc.</u>, 511 U.S. 863, 879 (1994). Disentitlement heavily burdens Bescond's exercise of the due process right to defend herself in court. <u>See</u> <u>In re Oliver</u>, 333 U.S. 257, 273 (1948); <u>Holden v. Hardy</u>, 169 U.S. 366, 390 (1898); <u>Hovey v. Elliott</u>, 167 U.S. 409, 417 (1897). As long as she is disentitled, she cannot mount a defense unless she travels to the United States, thereby risking pre-trial detention and trial in a foreign country and causing an extended absence that could jeopardize her career and would cut off her income (which, incidentally, is the sole support of her family). These burdens are especially weighty in view of France's non-extradition policy; as far as her home country is concerned, Bescond has no obligation to appear in the United States. <u>Cf.</u> <u>In re Hijazi</u>, 589 F.3d 401, 407–08 (7th Cir. 2009) (reasoning that because a foreign defendant was "under no obligation to travel to the United States," mandamus was justified to compel a ruling on motions to dismiss). On the other hand, if she remains in France, she has no opportunity to contest the charges against her and will live indefinitely with the imputation of being a

13

fugitive (bad enough for anyone, and ruinous for a banking executive). In this case, disentitlement thus imposes a penalty for staying home.

Disentitlement is a sanction "most severe." Degen v. United States, 517 U.S. 820, 828 (1996). In Degen, the Supreme Court considered a district court's inherent power to disentitle a claimant in a civil forfeiture suit. See id. at 821. At stake was the "right to a hearing to contest the forfeiture of . . . property, a right secured by the Due Process Clause." Id. at 822. The Court cautioned against "the harsh sanction of absolute disentitlement." Id. at 827.[3] A fortiori the sanction is harsh when the due process right at stake is to defend liberty; so the issue is important. The severity of disentitlement is sharpened here because disentitlement has been applied to bar Bescond's challenge to the CEA's extraterritoriality, that is, whether the law she is alleged to have violated can reach her and her conduct in the first place. Cf. In re Hijazi, 589 F.3d at 411 (concluding that a writ of mandamus ordering the district court to rule on the merits of a motion to dismiss an indictment was appropriate when the foreign defendant "raise[d] serious questions about the reach of U.S. law," and "there [was] reason to believe that [the] case raise[d] delicate foreign relations issues").

---

[3] Congress subsequently permitted disentitlement in forfeiture cases by statute. See 28 U.S.C. § 2466.

14

Bescond's right to defend against criminal charges is no less important than the interests implicated in other kinds of cases in which interlocutory review is available. A collateral order denying a motion to reduce bail is immediately appealable: the "traditional right to freedom before conviction . . . serves to prevent the infliction of punishment prior to conviction." Stack v. Boyle, 342 U.S. 1, 3–4, 6 (1951). And the "liberty interest" jeopardized by an order of commitment also supports interlocutory review. United States v. Gold, 790 F.2d 235, 239 (2d Cir. 1986). The penalty that disentitlement imposes prior to conviction, and the threat that it poses to the right to defend liberty, are just as important.[4]

The dissent posits that a foreign citizen such as Bescond enjoys the right to due process only on U.S. soil. It cites Agency for International Development v. Alliance for Open Society International, Inc., 140 S. Ct. 2082 (2020), which held that "foreign organizations operating abroad . . . possess no rights under the First Amendment," id. at 2087. But Bescond is not a free-floating foreigner invoking

_____

[4] The dissent says that we "have more often [than not] declined invitations to create ever more appealable collateral orders," Dissent at 4—an assertion supported by a paucity of citations. That says nothing about whether we should entertain *this* appeal. The dissent treats the collateral order doctrine as a series of watertight "exception[s]" on a "list." Id. at 3-4. In fact, the only category is the set of cases that satisfy the doctrine's three requirements.

the jurisdiction of our federal courts to vindicate a Constitutional right. It is the *government* that invoked such jurisdiction when it pursued indictment; Bescond is a defendant in a U.S. criminal court. As such, she is not without rights. If the right to due process does not attach until Bescond travels to the United States, it will have been infringed beyond remedy as soon as the right attaches.

Disentitlement also satisfies the requirement that issues for interlocutory review be completely separate from the merits of the underlying criminal action. The question is whether disentitlement is "collateral" to Bescond's "guilt or innocence of the charges against [her]." Gold, 790 F.2d at 238. In Bescond's case, disentitlement has nothing to do with her guilt or innocence: it bears not on whether she violated the CEA, but rather on her ability to defend herself. See id. (concluding that a defendant's competence to stand trial was "entirely separate" from the issue of whether he committed the alleged crime, and therefore suitable for immediate appellate review).

Accordingly, the disentitlement ruling "resolve[s] an important issue completely separate from the merits of the action." Flanagan, 465 U.S. at 265 (quoting Coopers & Lybrand, 437 U.S. at 468).

16

3.      Effectively unreviewable post-judgment

Disentitlement is effectively unreviewable on appeal from a final judgment.  Id. (quoting Coopers & Lybrand, 437 U.S. at 468).  This "third prong of the [collateral order] test is satisfied only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'"  Midland Asphalt Corp. v. United States, 489 U.S. 794, 799 (1989) (quoting United States v. MacDonald, 435 U.S. 850, 860 (1978)).  Bescond's right to mount a defense can be vindicated now or never.  If she remains in France—as France entitles her to do—she will never stand trial; naturally, she will have no opportunity to appeal and alleviate the damage to her life and reputation.  See Gold, 790 F.2d at 239 ("[T]here may never be a criminal trial if the defendant is never found competent to stand trial; in this instance, there would be no appellate review.").  Alternatively, if she succumbs to the pressure of disentitlement and appears in the United States, an appeal could not remedy "the very harm that [s]he seeks to avoid."  Sell v. United States, 539 U.S. 166, 177 (2003); see Gold, 790 F.2d at 239.  Even acquittal would not "undo th[e] harm."  Sell, 539 U.S. at 177; see Gold, 790 F.2d at 239.

17

4. Out-of-circuit views

The Sixth and Eleventh Circuits have ruled that they lacked jurisdiction to hear interlocutory appeals from rulings that disentitled fugitives. (The government erroneously contends that we, too, have so held.[5]) Respectfully, we disagree.

In United States v. Shalhoub, the Eleventh Circuit reasoned that "absent the assertion of a right not to be tried or the assertion of a right akin to the right against excessive bail, a defendant must accept the burdens of trial and sentencing before he obtains appellate review of an adverse ruling." 855 F.3d 1255, 1261 (11th Cir. 2017). While "[t]he right against excessive bail is a constitutional right," it continued, "[a defendant] has no right to avoid being labelled a fugitive." Id.

---

[5] The dissent invokes United States v. Golden, which disclaimed jurisdiction to review an order that denied a motion to dismiss made by a defendant who lived abroad and failed to appear. 239 F.2d 877, 878-79 (2d Cir. 1956). We do not regard that 1956 ruling, which was decided under the off-shoot rule, as foreclosing today's decision. Golden was a United States citizen who left the country for Thailand, renounced his citizenship, and was charged with failing to appear when drafted a few months after he decamped. Id. He therefore had recently been in this country, had been briefly abroad, and could defend himself here without the same weighty burdens facing Bescond.

18

However, Bescond does assert a constitutional right: the right to defend herself in court. And neither the Supreme Court nor this Court has categorically limited the collateral order doctrine to the right not to be tried and the right against excessive bail. For example, an order requiring the involuntary administration of antipsychotic drugs is immediately appealable because of the "privacy and security" interests at stake. Sell, 539 U.S. at 176–77 (quoting Winston v. Lee, 470 U.S. 753, 759 (1985)). So, too, is "an order transferring a juvenile to adult status" in a criminal proceeding, as it deprives the defendant of such "legal and practical benefits" as the sealing of records and pre-trial detention in settings favorable to adult prison. United States v. Doe, 49 F.3d 859, 865 (2d Cir. 1995).

In United States v. Martirossian, the Sixth Circuit reasoned that the "[c]onsiderable overlap" between the issues of whether the defendant was a fugitive, and whether the relevant criminal statute applied to foreigners, counseled against interlocutory review. 917 F.3d 883, 888 (6th Cir. 2019). True, Bescond challenges the CEA's assertedly extraterritorial application—a concept that, broadly speaking, overlaps with fugitivity. But the issues are distinct. In reviewing extraterritoriality, we consider the CEA's text. See RJR Nabisco, Inc. v.

19

Eur. Cmty., 136 S. Ct. 2090, 2101 (2016). In reviewing disentitlement, we ask whether Bescond meets the definition of a "fugitive" and consider whether disentitling her would serve the purposes of the doctrine. Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 280–81 (2d Cir. 1997). Although Bescond's location abroad is relevant to both analyses, see RJR Nabisco, 136 S. Ct. at 2101; Finkelstein, 111 F.3d at 280, we can—and do—decide one issue without deciding the other.

The Sixth Circuit rejected Martirossian's argument that fugitivity would be unreviewable on appeal from a final judgment, but conceded (fatally) that a defendant's fugitive status "become[s] moot" once "he submits to the jurisdiction of the federal courts." Martirossian, 917 F.3d at 888.

We are persuaded that we may properly review the disentitlement ruling as a collateral order.[6]

---

[6] The dissent casts our holding in broad terms, so that it is the dissent rather than this opinion that would provoke the abuses that the dissent foreshadows. Concerned about how we will deal with future foreign defendants abroad, the dissent conjures up cybercriminals and villains in caves. But whether in a cave or behind a screen, such bad actors have concealed themselves and are thus easily distinguishable from Bescond. In any event, every disposition leaves unresolved questions that may arise in cases that follow in its wake. That is why we turn on the lights.

20

**B.      Pendent appellate jurisdiction**

Does jurisdiction to review the disentitlement ruling empower us to review the alternative rulings on the merits of extraterritoriality and due process? It does not.

Under the doctrine of pendent appellate jurisdiction, an interlocutory appeal of one ruling permits us "to exercise jurisdiction over other, otherwise unappealable interlocutory decisions, where such rulings are 'inextricably intertwined' with" or "'necessary to ensure meaningful review' of the appealable order." Atlantica Holdings, Inc., 813 F.3d at 116–17 (quoting Myers, 624 F.3d at 552). Pendent appellate jurisdiction is available only in "narrowly circumscribed" circumstances, "in order to avoid 'encourag[ing] parties to parlay [reviewable] collateral orders into multi-issue interlocutory appeal tickets,' thereby undermining the general rule that an appeal may not be taken until a final judgment has been entered." Id. at 117 (first alteration in original) (quoting Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 49–50 (1995)). "[T]he exercise of pendent appellate jurisdiction is discretionary," and "we will only exercise [such jurisdiction] in exceptional circumstances." Id. (quoting Myers, 624 F.3d at 553); see Bolmer v. Oliveira, 594 F.3d 134, 141 (2d Cir. 2010) ("[P]endent appellate

21

jurisdiction should be exercised sparingly, if ever." (quoting <u>Mancuso v. N.Y.</u>

<u>State Thruway Auth.</u>, 86 F.3d 289, 292 (2d Cir. 1996))).

These circumstances are insufficiently exceptional.  Bescond asserts that

review of the merits of extraterritoriality and due process is necessary to ensure

meaningful review of her disentitlement.  But her argument at best is that the

concepts of extraterritoriality and due process would be enlightening because

they illustrate why she is justified in remaining abroad.  This is not enough.  <u>See</u>

<u>Myers</u>, 624 F.3d at 553–54 (explaining that, even when two independent issues

are factually or legally similar, pendent appellate jurisdiction does not lie when

"resolution of the non-appealable order would require us to conduct an inquiry

that is distinct from and 'broader' than the inquiry required to resolve solely the

issue over which we properly have appellate jurisdiction" (quoting <u>Britt v.</u>

<u>Garcia</u>, 457 F.3d 264, 273 (2d Cir. 2006))).  Not incidentally, jurisdiction under the

collateral order doctrine to review the disentitlement ruling depends, in part, on

its separateness from the merits of extraterritoriality and due process.

Accordingly, we decline to exercise pendent appellate jurisdiction to

review the alternative rulings on the merits.[7]

---

[7] We have no need to decide the correctness of the government's assertion that
we can never exercise pendent jurisdiction in a criminal case.

**II**

The sole issue that we have jurisdiction to review is the application of the fugitive disentitlement doctrine. The doctrine "applies only to fugitives from justice." Finkelstein, 111 F.3d at 281. So in order to disentitle a litigant, a court must first determine that the litigant is a fugitive. The court may then exercise discretion to disentitle the fugitive—but only if doing so would serve the doctrine's objectives. See id. at 280. We hold that Bescond is not a fugitive, and that, even if she were, the district court abused its discretion in concluding that disentitlement was justified.

**A.    Fugitivity**

The issue of whether Bescond meets the definition of a "fugitive" is reviewed de novo. Collazos v. United States, 368 F.3d 190, 195 (2d Cir. 2004). The ordinary meaning of the term "fugitive" does not describe Bescond. A fugitive is "[s]omeone who flees or escapes; a refugee," or "[a] criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution,

imprisonment, service of process, or the giving of testimony, esp[ecially] by fleeing the jurisdiction or by hiding." BLACK'S LAW DICTIONARY (11th ed. 2019).

Fugitivity implies some action by Bescond to distance herself from the United States or frustrate arrest. Bescond took no such action.

As the district court recognized, Bescond is not a fugitive under either of the two categories at common law: (1) traditional fugitives and (2) constructive-flight fugitives. A traditional fugitive is "[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." Finkelstein, 111 F.3d at 281 (alterations in original) (quoting BLACK'S LAW DICTIONARY (5th ed. 1979)). Bescond has neither fled nor concealed herself.

Nor is Bescond a constructive-flight fugitive: a person "who allegedly committed crimes while in the United States but who w[as] outside the country—for whatever reason—when [she] learned that [her] arrest[] w[as] sought and who then refused to return to the United States in order to avoid prosecution." Collazos, 368 F.3d at 199. Bescond was not in the United States while allegedly committing the charged conduct. See In re Hijazi, 589 F.3d at 412 (The fugitive disentitlement doctrine "does not apply . . . [to a defendant who]

24

has never been in the country, . . . has never set foot in Illinois, and . . . owns no property in the United States.").  Nor is she refusing to return to the United States to avoid prosecution; she simply remains at home, as her home country permits her to do.  So she does not qualify as a constructive-flight fugitive.

In forfeiture cases, Congress has extended fugitive status to persons who were not in the United States to begin with—those who "decline[] to enter . . . the United States to submit to its jurisdiction" or "otherwise evade[] the jurisdiction of the court in which a criminal case is pending against [them.]"  28 U.S.C. § 2466(a)(1)(B)–(C); Collazos, 368 F.3d at 199–200.  This extension is justified for a reason that fits the forfeiture context specifically:

> the unseemly spectacle . . . of a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction.

Collazos, 368 F.3d at 200.  But, as this is not a forfeiture case, the forfeiture statute does not apply.

In short, Bescond is not a fugitive under existing law.  Cf. Gao v. Gonzales, 481 F.3d 173, 176–77 (2d Cir. 2007) ("[T]he 'paradigmatic object of the doctrine is the convicted criminal who flees while his appeal is pending.'" (quoting

25

Antonio-Martinez v. I.N.S., 317 F.3d 1089, 1092 (9th Cir. 2003))); United States v.

Awadalla, 357 F.3d 243, 246 (2d Cir. 2004) ("Because Awadalla absconded after

challenging his judgment of conviction in this Court, there is no doubt that we

have the authority to dismiss his appeal."); United States v. Morgan, 254 F.3d

424, 426–27 (2d Cir. 2001) (holding that the district court properly disentitled a

criminal defendant who fled the United States after pleading guilty and before

sentencing); Finkelstein, 111 F.3d at 281–82 (concluding that litigants who failed

to comply with bench warrants and appear for depositions, whose whereabouts

were unknown, and who faced "an immense judgment" were fugitives); Bar-

Levy v. U.S. Dep't of Just., 990 F.2d 33, 35 (2d Cir. 1993) ("[T]he alien who is a

fugitive from a deportation order should ordinarily be barred by his fugitive

status from calling upon the resources of the court to determine his claims.").

Although we express no view as to its merits, it is telling that Bescond

raises a nonfrivolous extraterritoriality claim—especially in view of our decision

in Prime International Trading, Ltd. v. BP P.L.C., 937 F.3d 94 (2d Cir. 2019), cert.

denied, No. 19-1141, 2020 WL 3146710 (June 5, 2020).[8]  Labeling a foreign

defendant a fugitive can be enough to coerce submission to U.S. jurisdiction

---

[8] We decided Prime International after the district court issued its order in this case.

26

wholly regardless of whether the charged statute reaches individuals outside our territory. That result is in tension with principles that underlie the presumption against extraterritoriality. See RJR Nabisco, 136 S. Ct. at 2100 (providing that the presumption "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries" and "reflects the more prosaic 'commonsense notion that Congress generally legislates with domestic concerns in mind'" (quoting Smith v. United States, 507 U.S. 197, 204 n.5 (1993))). And if our law does not reach Bescond or her conduct, can it be said that she is in flight from it?

The district court acknowledged the tension, but reasoned that it could be alleviated in the discretionary ruling on whether to apply the doctrine: "[w]ere a court to identify any abuse or prosecutorial overreaching, it could decline to apply disentitlement and reach the merits of a defendant's motion even if the defendant could be classified as a fugitive." Sindzingre, 2019 WL 2290494, at *7 n.5. But if the assertion of prosecutorial overreach is premised on extraterritoriality, there may be no opportunity to detect that overreach precisely because the fugitive disentitlement doctrine preempts consideration of the merits.

27

Bescond's presence abroad is unrelated to the American prosecution. She is a French citizen, living in France, where she supports a family, and is employed in a legitimate line of work. A different result may obtain if a person's presence abroad is in any part covert or suspect: a hideout, sanctuary, or escape from the reach of law. Arguably to the contrary are the Sixth Circuit's decision in Martirossian, 917 F.3d at 890, and In re Kashamu, 769 F.3d 490, 493 (7th Cir. 2014). But see In re Hijazi, 589 F.3d at 412–13. But if the doctrine were to be expanded to reach someone such as Bescond, who stays at home abroad, without concealment or evasion, Congress, not the courts, should weigh the competing issues and values and determine whether such an expansion is warranted. As observed in Degen: "Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities," including disentitling fugitive defendants, but "[t]he extent of these powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." 517 U.S. at 823.

**B.    Disentitlement**

We go on to review the discretionary ruling of disentitlement because (1) it is closely related, a ruling on disentitlement being the business end of a fugitivity finding; and (2) courts faced with close questions of fugitivity may prefer to decide on a question confided to discretion.  In this case, even if Bescond were a fugitive, disentitlement was improper.

We review disentitlement for abuse of discretion.  Morgan, 254 F.3d at 426. A court abuses its discretion when it:

> (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions.

Klipsch Grp., Inc. v. ePRO E-Com. Ltd., 880 F.3d 620, 627 (2d Cir. 2018) (citation omitted).

Disentitlement serves four purposes: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape."  Finkelstein, 111 F.3d at 280.  Courts exercise

29

their discretion to apply the doctrine "[b]earing these objectives in mind."[9]  Id.

Here, the conclusion that disentitlement furthered these four objectives was an

abuse of discretion.

As to the enforceability of decisions, disentitlement is a disproportionately

severe response to Bescond's absence and therefore too harsh a means of

ensuring mutuality in the litigation.  See Degen, 517 U.S. at 823–24 ("Principles of

deference counsel restraint in resorting to inherent power and require its use to

be a reasonable response to the problems and needs that provoke it." (citations

omitted)).  It cannot be said that Bescond fled the district court's jurisdiction, let

alone that she did so to seize an unfair advantage or game the system.  Cf. Gao,

481 F.3d at 177 ("The gravamen of [the] petition is the posture of 'heads I win,

tails you'll never find me.'" (quoting Antonio-Martinez, 317 F.3d at 1093)).  Other

than to avoid a ruinous designation as a fugitive, Bescond has no reason to travel

here: it is not shown that she has residence, immigration status, job, or family in

this country, and she allegedly committed the charged offense entirely from

abroad.  "[D]isentitlement is too blunt an instrument for" a foreign defendant in

Bescond's circumstances.  Degen, 517 U.S. at 828.

---

[9] Other factors may be considered.  See Nen Di Wu, 646 F.3d at 136.

As to whether Bescond is "flouting the judicial process," as the district court found she is, Sindzingre, 2019 WL 2290494, at *8, there is no basis for a finding that Bescond is exhibiting disrespect for U.S. law. See Gao, 481 F.3d at 176 ("[The] reasons why the inherent power of the court to manage its own affairs should be used to dismiss an appeal of a party who is a fugitive . . . include . . . the need for a sanction to redress the fugitive's affront to the dignity of the judicial process."). All Bescond has done is stay home, where she remained during the allegedly criminal scheme, and where her government permits her to live freely. Her reasons for litigating from home are legitimate and fair.

As to the discouragement of flight: given Bescond's circumstances, there exists no cohort of fugitives who would perceive an adjudication of her motions as inducement or inspiration to flee the jurisdiction of our courts. Bescond was never here; her charged offense is financial, diffuse, and novel, and it affected the United States—allegedly—only through a chain of other actors in other countries; she did not act for a criminal organization; she was in a legitimate line of work, as a banking executive; and her home country protects her from extradition. It cannot be said that an adjudication of Bescond's motions on the

31

merits "would eradicate any incentive for [others] to comply with an arrest warrant, submit to a court's jurisdiction, and respond to the Government's allegations." Sindzingre, 2019 WL 2290494, at *8. "[W]e question whether a slight general deterrence effect can outweigh the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible." Nen Di Wu, 646 F.3d at 137.

Finally, as to prejudice, the district court was over-solicitous of the government's claim. The court concluded that "Bescond's failure to appear prejudices the Government's ability to locate witnesses and present evidence at trial." Sindzingre, 2019 WL 2290494, at *9. However, the prejudice to consider is that "caused by the defendant's escape"—of which none is identified. Finkelstein, 111 F.3d at 280. The government has no apparent need to acquire new evidence related to Bescond's period of absence. See Nen Di Wu, 646 F.3d at 138 (concluding that the prejudice factor did not support disentitlement when the petitioner did not "premise[] his claim to relief entirely on events that occurred during the period of his fugitivity, thereby making the government rebut new facts in order to defeat his petition on the merits"). Concern that existing evidence would grow stale may arise in some cases; but here, it is odd,

32

given that by the time the indictment was filed, about six to seven years had already elapsed since the charged conduct.

The district court did not consider the countervailing prejudice to Bescond. Disentitlement enables the government to coerce Bescond's presence in court by imposing financial, reputational, and family hardship regardless of her guilt or innocence, and regardless of whether the indictment charges violations of a statute that applies extraterritorially. So long as the government surmounts the low threshold of securing an indictment, any soul on the planet may be deemed a fugitive, and disentitlement would then bar a challenge to extraterritoriality from abroad, requiring the foreigner to leave home and face arrest and detention to have any hope of securing dismissal. Such a result contravenes the rationales that underly disentitlement and assigns no weight to the sovereignty of other nations.

Discretion depends on circumstances. See Nen Di Wu, 646 F.3d at 138 ("Where the law calls for the exercise of discretion, facts matter, and cases cannot be lumped together on account of formal similarities."). In Bescond's case, given her innocent residence as a foreign citizen abroad, given the nature of the charged offense and her remoteness from the alleged harm that it caused, given

33

her line of work, and given her nonfrivolous challenge to the extraterritoriality of the criminal statute, the exercise of discretion to disentitle her was an abuse.

## CONCLUSION

For the foregoing reasons, the order disentitling Bescond is reversed; the case is remanded for further proceedings to consider or reconsider the merits of her motions to dismiss; and the appeal is dismissed insofar as it seeks review of the alternative rulings on extraterritoriality and due process.

DEBRA ANN LIVINGSTON, *Chief Judge*, dissenting:

The Court's decision today is a victory for Muriel Bescond. But our Circuit's law is a silent loser. In its effort to remedy what the majority perceives as a case of prosecutorial overreach, the majority creates a new class of interlocutory appeals that will greatly disserve the interests of justice when applied to the substantial number of cases in which foreign-based defendants are charged with violating our laws and harming our people. In doing so, the majority departs from our sister circuits to create a novel rule of appellate jurisdiction. Even if I thought the majority's approach to the fugitive disentitlement doctrine were sound—and I do not—I cannot conclude that Congress has given us appellate jurisdiction to consider interlocutory appeals of fugitive disentitlement orders. I must therefore respectfully dissent from the majority's conclusion that we may review such an order today.[1]

**I**

As my colleagues do, I start with the statute that governs our appellate jurisdiction. It states, in relevant part, that "[t]he courts of appeals . . . shall have

---

[1] Having concluded that we lack appellate jurisdiction entirely, I agree with the majority that we lack pendent appellate jurisdiction to review Bescond's additional arguments. Maj. Op. at 21–23. To this limited extent, I concur.

1

jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. This rule, known as the final judgment rule, is "crucial to the efficient administration of justice." *Flanagan v. United States*, 465 U.S. 259, 264 (1984). "Finality as a condition of review is an historic characteristic of federal appellate procedure," and Congress, "from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration." *See Cobbledick v. United States*, 309 U.S. 323, 324–25 (1940) (noting that a version of the final judgment rule can be traced back to the first Judiciary Act).

The interest in prohibiting review of non-final orders, as the Supreme Court observed in 1940, is "especially compelling in the administration of criminal justice" where "encouragement of delay is fatal to the vindication of the criminal law." *Id.* at 325. The policy arguments in favor of the final judgment rule in criminal cases, moreover, have only become stronger over time, as the criminal dockets of the federal courts have expanded. *See Flanagan*, 465 U.S. at 264. The prompt resolution of criminal cases benefits both the prosecution, which otherwise, as time passes, may find its "ability to meet its burden of proof . . .

2

greatly diminish," and also criminal defendants, who generally "have a strong interest in speedy resolution of the charges . . . ." *Id.*

The collateral order doctrine, first articulated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), is a narrow exception to the final judgment rule for a "limited category of cases falling within" its strictures. *Flanagan*, 465 U.S. at 265 (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982)). Under this doctrine, courts of appeals may review orders only when they "(1) conclusively resolve a disputed question that (2) is an important issue completely separate from the merits of the action, and that (3) would be effectively unreviewable on appeal from a final judgment." *United States v. Magassouba*, 544 F.3d 387, 400 (2d Cir. 2008). "Because of the compelling interest in prompt [criminal] trials," this exception is applied "with the utmost strictness in criminal cases." *Flanagan*, 465 U.S. at 265.

To date, in the 70-plus years since *Cohen* was decided, the Supreme Court has recognized only four types of orders in criminal cases that satisfy these demanding requirements: orders denying motions to dismiss on double jeopardy grounds; orders denying such motions brought under the Speech or Debate Clause; orders denying motions to reduce bail; and orders involving the forced

administration of antipsychotic medication. *See id.* at 265–66 (listing the first three of these exceptions); *see also Sell v. United States*, 539 U.S. 166, 176–77 (2003) (recognizing the fourth). This is a short list. And as Judge Sutton recently observed, "the Supreme Court has cautioned us time, time, and time again not to expand the collateral order club's 'selective . . . membership.'" *United States v. Martirossian*, 917 F.3d 883, 887 (6th Cir. 2019) (alteration in original) (citations omitted) (quoting *Will v. Hallock*, 546 U.S. 345, 350 (2006)).

True, this Court has gone beyond these exceptions. *See, e.g.*, *United States v. Doe*, 49 F.3d 859, 865 (2d Cir. 1995) (holding that order allowing the government to try a juvenile as an adult is immediately appealable). Yet we, too, have more often declined invitations to create ever more appealable collateral orders. *See, e.g.*, *United States v. Robinson*, 473 F.3d 487, 490–92 (2d Cir. 2007) (holding that the "district court's denial of a motion to strike a death penalty notice" is not an appealable collateral order); *United States v. Aliotta*, 199 F.3d 78, 81 (2d Cir. 1999) (holding that denial of motion to dismiss an indictment on double jeopardy grounds *after* a guilty plea is not reviewable).

Indeed, in a case much like Bescond's, we held that the collateral order doctrine did *not* permit review of the denial of a pretrial motion to dismiss an

indictment charging failure to report for induction even though the defendant affirmed: (1) that he was neither a citizen, national, nor resident alien of the United States subject to the Universal Military Training and Service Act; (2) that the government had papers in its possession showing as much; and (3) that he should not have to travel thousands of miles from his home in Thailand in order to have the indictment quashed. *United States v. Golden*, 239 F.2d 877, 879–81 (2d Cir. 1956). The majority attempts to distinguish *Golden* in a footnote, pointing out that the defendant in that case had formerly been a U.S. citizen before moving to Thailand and renouncing his citizenship. Maj. Op. at 18 n.5. Viewing that fact as dispositive, the majority concludes that because the defendant in *Golden* "had recently been in this country" and had only "briefly" been abroad, he "could defend himself here without the same weighty burdens faced by Bescond." *Id.*

But the distinction that the majority draws between this case and *Golden* serves only to highlight a serious flaw in its underlying analysis. At bottom, the majority deems this matter appropriate for application of the collateral order doctrine on the theory that Bescond, "a foreign citizen who has remained at home abroad," has a due process right—a constitutional right—to challenge her

disentitlement without submitting to the jurisdiction of the district court.[2] *Id.* at 12–16. But the majority does not extend this privilege to Americans. Thus, while Bescond may seek immediate review of her disentitlement order, an American citizen residing in Paris (however "at home") would be unable to claim the same ability *even if he had been indicted for the very same crime*. The majority in effect interprets the Due Process Clause to afford *greater* protection to foreign citizens located abroad than to similarly situated Americans.

This should have been a signal that *something* in its analysis was constitutionally unsound. To be sure, were she to appear, Bescond would be entitled to the full panoply of due process rights afforded to defendants in American criminal proceedings. But she (like her American counterpart) has no due process right to litigate from afar while refusing to comply with rulings with which she disagrees. Indeed, it is "long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution" and that it is "foreign citizens *in the United States . . .* [who] enjoy . . . the right to due process in a criminal trial." *Agency for Int'l Dev. v.*

---

[2] The precise nature of the due process rights that the majority would afford to foreign nationals like Bescond is discussed in greater detail below. *See infra* section II.B.1.

6

*All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020). "If the rule were otherwise,

actions by American military, intelligence, and law enforcement personnel

against . . . foreign citizens in foreign countries would be constrained by the

foreign citizens' purported rights under the U.S. Constitution. That has never been

the law."[3]  *Id.* at 2086–87.

The majority today adds one more exception to the final judgment rule in

criminal cases without grappling with obvious problems in the constitutional

theory that underlies its ill-advised holding. Affirming that this Court has

jurisdiction under the collateral order doctrine to review orders "disentitling a

foreign citizen who has remained at home abroad," Maj. Op. at 12, it affords a due

---

[3] The majority dismisses *Agency for International Development* on the theory that Bescond, unlike the foreign organizations in that case, is not a "free-floating foreigner" invoking the jurisdiction of a federal court to vindicate a supposed constitutional right, but is, instead, an indicted criminal defendant. Maj. Op. at 15–16. But *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), demonstrates that the majority's distinction is untenable. Verdugo-Urquidez, like Bescond, had been charged and was, in fact, incarcerated in this country pending trial when federal law enforcement agents participated in a search of his properties in Mexico. The Supreme Court nevertheless rejected the Ninth Circuit's "global view" of the Constitution's application, holding that Verdugo-Urquidez could not claim Fourth Amendment rights as to that search. *Verdugo-Urquidez*, 494 U.S. at 274. To repeat, Bescond *is* entitled to all the due process rights to which every criminal defendant is entitled in American courts. But notwithstanding the majority's flawed analysis, she cannot invoke the Constitution to claim rights singular to foreign citizens at home abroad—such as, here, the supposed due process right to seek favorable rulings in her criminal case while refusing to submit to unfavorable determinations.

process privilege to foreign citizens "at home abroad" that is unavailable to similarly situated Americans. In doing so, it creates a split with our sister circuits who have held that fugitive disentitlement orders—including those specifically involving, as here, a foreign citizen located abroad—are *not* immediately appealable. *See Martirossian*, 917 F.3d at 887; *United States v. Shalhoub*, 855 F.3d 1255 (11th Cir. 2017). As set forth below, where we specifically address the collateral order test, our sister circuits have the better of this argument. We thus err in creating this circuit split and should instead conclude that we lack appellate jurisdiction to review the district court's order.

## II

### A

As discussed, an order must satisfy three conditions to be eligible for interlocutory review as a collateral order: (1) it must conclusively resolve a disputed question; (2) that question must be important and completely separate from the merits; and (3) that question must be unreviewable as part of an appeal from a final judgment. *Magassouba*, 544 U.S. at 400.

The majority holds that this Court has jurisdiction "to review an order disentitling a foreign citizen who has remained at home abroad—in this case,

8

without evasion, stealth, or concealment." Maj. Op. at 12. But at the very start—before even turning to the narrow circumstances in which an interlocutory order qualifies as collateral—the majority's very framing of the "disputed question" opens the door to the piecemeal appellate adjudication of criminal cases brought against foreign-based defendants who are not citizens of the United States.

To be sure, the majority's holding suggests that it does not, in effect, entitle *each* and *every* foreign citizen indicted in federal court to the substantial delay associated with consideration of a fugitive disentitlement order so long as the defendant is outside the United States and declines to appear. But this is an illusion. Because the majority is wholly silent on which foreign defendants its formula covers and how this formula is to apply, its new exception to the final judgment rule portends significant future delays in many criminal cases involving foreign-based defendants—precisely the sort of consequence Congress sought to avoid with the final judgment rule.

Consider a foreign citizen charged with committing a cybercrime in the United States. Does such a person "remain[] at home abroad," entitling him to review of a disentitlement order, so long as the indictment affirmatively alleges that he acted from outside the United States? If the indictment is silent or unclear

9

on this question, may he obtain discovery to pursue it? What if he regularly visits—even owns property in the United States—but is not alleged to have himself committed any act here in connection with the crime? Does such a person "remain at home"—a result which would be in some tension with Congress's judgment in 28 U.S.C. § 2466 that a district court may properly disentitle an individual from pursuing a claim in a civil forfeiture action that is proceeding in parallel to a pending criminal case when that person has "decline[d] to enter or reenter the United States to submit to its jurisdiction." And what if our hypothetical defendant commissions *others* to undertake serious crimes within the United States? Does such a person "remain at home"? The logic of the majority's new rule would appear to apply equally to an overseas foreign terrorist who kills Americans abroad, and an overseas foreign terrorist who directs an attack on U.S. soil, each of whom can be said to have "remained at home" as Bescond has done. The majority claims, without explanation, that "such bad actors have concealed themselves and are thus easily distinguishable from Bescond." Maj. Op. at 20 n.6. But apart from that oblique reference, the majority nowhere explains what its "concealment" limitation means. Does a terrorist or cybercriminal who plots from a jurisdiction in which he can live openly with state support "conceal" himself?

10

All this is left for resolution in future cases that likely will come to us through dilatory interlocutory appeals.

Moreover, it is not even clear, to me, that the majority's new exception to the final judgment rule will remain limited to fugitive disentitlement orders. The majority says that foreign citizens who "remain at home" are entitled to collateral review of a district court's disentitlement order because, *inter alia*, the order unconstitutionally burdens their right to defend themselves by "impos[ing] a penalty for staying home." *Id.* at 14. This is incorrect, as further discussed below. But starting from this faulty premise, what happens in the event that a fugitive disentitlement order is, as here, overturned on appeal and the district court, on remand, determines that a motion to dismiss the indictment should be denied *on the merits*—or that such a motion cannot be decided before trial? The trial cannot proceed in the defendant's absence. *See Crosby v. United States*, 506 U.S. 255, 262 (1993) (noting that Rule 43 of the Federal Rules of Criminal Procedure "prohibits the trial in absentia of a defendant who is not present at the beginning of the trial"); *see also Degen v. United States*, 517 U.S. 820, 826 (1996) (noting that where dual citizen of U.S. and Switzerland remained in Switzerland and had not returned to face drug charges, "[t]he criminal trial cannot begin until he returns"). But such a

defendant will surely claim that the harms visited by virtue of the pending indictment are no less severe than the fugitive disentitlement order itself—so that interlocutory review of the denial of his motion to dismiss is also imperative, lest he be penalized for staying home. Given the reasoning in the majority opinion, by what principle would this argument be rejected? The Supreme Court warned in *Hollywood Motor Car Co.*, that when the collateral order doctrine is misunderstood, the "policy against piecemeal appeals in criminal cases" is in constant danger of being "swallowed by ever-multiplying exceptions." 458 U.S. at 270. Here, the majority's misunderstanding of the doctrine, as next set forth, sets the stage for this very result.

**B**

Regardless of how the issue is framed—whether a foreign citizen remains at home (with or without evasion), tours the world, or hides in a cave, we lack appellate jurisdiction to consider a fugitive disentitlement order under the collateral order doctrine. To be sure, there may be circumstances in which such orders may properly be the subject of mandamus relief. But as to the collateral order doctrine's three-part test, the district court's order satisfies neither the

12

second nor third requirements.[4] Bescond's case presents neither an important issue completely separate from the merits nor an issue that is effectively unreviewable on appeal from a final judgment. Accordingly, the majority errs in entertaining this appeal.

**1**

As to the second requirement of the collateral order test—that the issue appealed be important and completely separate from the merits—the majority asserts it is satisfied here on its theory that "[d]isentitlement heavily burdens Bescond's exercise of the due process right to defend herself in court." Maj. Op. at 13. As already stated, Bescond, a foreign citizen located abroad who has not submitted to the jurisdiction of the district court, has no such due process right.

---

[4] In his opinion for the Sixth Circuit, Judge Sutton suggested that fugitive disentitlement orders might not even meet the first of the three requirements. *Martirossian*, 917 F.3d at 887. Judge Sutton reasoned that because the district court in that case held a motion to dismiss in abeyance until Martirossian submitted to the jurisdiction of the court, there was no final resolution of the motion. *Id.* Similarly here, the district court's determination that Bescond is a fugitive and should be disentitled would no doubt be revisited if Bescond were to appear. The government has conceded, however, that the question of whether Bescond is a fugitive was finally resolved by the district court. *See* 15A CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3911.1 (2d ed. Supp. 2020) ("[A] disposition ordinarily should be held final for purposes of collateral order appeal when the district judge believes that it has been finally resolved for purposes of whatever proceedings remain . . . ."). Accordingly, I do not further address this point.

But even assuming *arguendo* that the Due Process Clause could apply to Bescond while she remains in France, the majority's conclusion would still be wrong. As the Supreme Court has explained, a question is "important" for the purposes of the collateral order doctrine when it is "weightier than the societal interests advanced by the ordinary operation of final judgment principles." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994). It is separate from the merits when collateral to the issue of guilt or innocence. *United States v. Gold*, 790 F.2d 235, 238 (2d Cir. 1986). Here, the order fails on *both* counts.

As to importance, the four appealable collateral orders the Supreme Court has recognized all protect constitutional rights.[5] The majority, cognizant of this, argues that disentitlement gravely burdens Bescond's due process right to defend herself in court. Maj. Op. at 13. But this is simply incorrect. Bescond is perfectly able to defend herself in court if and when she is subject to the court's jurisdiction. But no party has a due process right to insist on that jurisdiction for rulings favorable to herself while at the same time making clear her refusal to comply with

---

[5] And not just any constitutional right will do. *See, e.g., Hollywood Motor Car Co.*, 458 U.S. at 268–69 (holding that denial of motion to dismiss based on claim of prosecutorial vindictiveness is not appealable before trial); *United States v. MacDonald*, 435 U.S. 850, 857 (1978) (rejecting argument that claims based on Sixth Amendment right to speedy trial are immediately appealable).

any *unfavorable* result. Here, Bescond sought dismissal of the indictment and also discovery from the government, despite showing no willingness to abide by any order contrary to her interests. J. App'x at 44. The fugitive disentitlement doctrine exists precisely to prevent this manner of nonmutual litigation. *See Gao v. Gonzales*, 481 F.3d 173, 176 (2d Cir. 2007).

Nor does the district court's labeling Bescond a fugitive raise a due process concern, much less an "important" one. Bescond has no "more of a freestanding right not to be labeled a fugitive, than a criminal defendant has a freestanding right not to be labeled a defendant." *Martirossian*, 917 F.3d at 887 (quoting *Shalhoub*, 885 F.3d at 1261–62). And even assuming *arguendo* that deeming her a fugitive *did* implicate a constitutionally protected interest in her reputation, "'[w]here a person's good name . . . is at stake,' due process requires only notice and an opportunity to be heard," and Bescond, like the defendant in *Shalhoub*, "enjoys a right to appear in court, to defend [herself] against the indictment, and to clear [her] name if she prevails." *Shalhoub*, 855 F.3d at 1261–62 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). [6] Thus, contrary to the majority's

---

[6] Moreover, Bescond actively *litigated* the issue of her fugitivity in the district court, a fact which even further undercuts the majority's claim that her due process rights are somehow at stake.

15

conclusion, Bescond has failed to raise an issue of importance of more substantial weight than the societal interests furthered by the final judgment rule.

To be clear, this is not to deny the harms attendant on being charged with crimes, including, here, the necessity of travel to defend against the charge. But the argument that this case presents a due process problem proves too much. If Bescond's situation raised such a concern, then the entire fugitive disentitlement doctrine would be on unsure constitutional footing, which it is not. For Bescond suffers no impairment of her ability to defend herself in court that distinguishes her from many other foreign citizens (or, as noted above, Americans) for whom the majority does not even *purport* to fashion an exception to the final judgment rule.

Consider a hypothetical defendant alleged to have committed fraud while on a business trip to the United States who then returns home to France before being indicted. This defendant, under traditional principles, would qualify as a fugitive upon his refusal to reenter the United States—and despite any claim on his part that the allegations in the indictment regarding his conduct in the United States are untrue. *See Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004). The majority does not purport to extend its new exception to the final judgment rule

to this defendant and would not permit him to seek interlocutory review of any disentitlement determination because he did not "remain at home."

Bescond, in contrast, is not alleged in the indictment to have herself acted within the United States as part of the conspiracy with which she is charged. But the majority offers no explanation—none—how this fact affects her due process right to present a defense so as to distinguish her disentitlement order from our hypothetical defendant's, and thus to establish her own order's importance. The majority emphasizes the burdens posed by Bescond's location abroad and analogizes these burdens to the right against excessive bail and the liberty interest at risk when a court enters an order of commitment. Maj. Op. at 13–16. But Bescond is not detained. Further, any pretrial detention she might be subject to upon arrival in the United States, just as our hypothetical defendant's, would be pursuant to the guarantees of the Constitution, including any permissible appeals of collateral orders. *Id.* at 13. Assuming the majority does not mean to suggest there is a serious procedural deficiency with our ordinary treatment of defendants who primarily reside abroad yet commit criminal acts within the United States, it is difficult to see why Bescond's interest in avoiding these procedures rises to the level of importance sufficient to justify an immediate appeal.

The Supreme Court's decision in *Degen* does not alter this conclusion. *Degen* involved the question whether a district court "may strike the filings of a claimant in a forfeiture suit and grant summary judgment against him for failing to appear in a related criminal prosecution." 517 U.S. at 821. The Court held that disentitlement in these circumstances was unjustified. Critical to that conclusion, however, was the Court's recognition that the claimant's absence created no risk of delay or frustration in adjudicating the forfeiture matter or in enforcing the judgment because "the court's jurisdiction over the property [was] secure." *Id.* at 825. In such circumstances, because "[t]he dignity of a court derives from the respect accorded its judgments," disentitlement was unnecessary to protect this "substantial" dignitary interest. *Id*. at 828.[7] But *Degen* is not this case. The district court, on remand, will have *no* ability to enforce any judgment adverse to Bescond, even as it is instructed to proceed. *Degen* thus fails to support the argument that Bescond's disentitlement raises an important due process concern.

---

[7] Notably, Congress has since taken the opposite view and granted the district courts broad authority to disentitle absent claimants in forfeiture cases pending simultaneously with a criminal prosecution, notwithstanding that judgments against a *res* may be enforced in the absence of the claimant. See 28 U.S.C. § 2466. This action by a coordinate branch itself charged with upholding the Constitution suggests that concerns about the harshness of disentitlement do *not* have a constitutional dimension.

Moreover, even if Bescond *had* identified an issue of sufficient importance to outweigh the substantial societal interests reflected in the final judgment rule, she has still failed to show that this issue is sufficiently distinct from the merits. To satisfy the demanding strictures of the collateral order doctrine, an interlocutory ruling must represent not only an important issue, but one "*completely* separate from the merits of the action." *Magassouba*, 544 F.3d at 400 (emphasis added). And here, as in *Martirossian*, "[c]onsiderable overlap . . . exists between the arguments underlying [this] interlocutory appeal and the merits of the case." 917 F.3d at 888. Martirossian argued that he was not a fugitive from the United States "because he ha[d] never traveled to the country and his targeted conduct occurred abroad." *Id*. For similar reasons, he argued that the money laundering statute that he was alleged to have violated didn't apply to him. In such circumstances, the Sixth Circuit concluded that the issues pressed by Martirossian in his interlocutory appeal were "not sufficiently distinct from the merits of the action to warrant mid-case review" pursuant to the collateral order doctrine. *Id.* at 887.

So too here. The majority observes that disentitlement "bears not on whether [Bescond] violated the [Commodities Exchange Act ("CEA")] [*i.e.*, the merits of the case], but rather on her ability to defend herself." Maj. Op. at 16. True, a decision

on disentitlement does not *entail* a certain resolution of the merits: "[W]e can . . . decide one issue without deciding the other." *Id.* at 21. But there is undeniably "considerable overlap," both as to the relevant facts and "in the arguments underlying" the two issues here, *Martirossian*, 917 F.3d at 888, so that the disentitlement issue is not "completely separate" from the merits, as the collateral order doctrine requires, *Magassouba*, 544 F.3d at 400.

Bescond argues that she does not qualify as a fugitive from the United States because she is "a French citizen with virtually no connection to the United States," Appellant's Br. at 1, and the indictment does not charge her with performing any acts within the country. But as in *Martirossian*, this argument is intertwined with her argument that the statute she is alleged to have violated—in Bescond's case, Section 9(a)(2) of the CEA—does not apply to her and, indeed, that her prosecution "rests upon an unquestionably impermissible extraterritorial application" of this provision. Appellant's Br. at 4. This latter claim goes to the merits, may generally be incapable of resolution before trial, and should not be decided prematurely in the context of addressing a defendant's refusal to appear.[8] As in *Martirossian*, "[a]

---

[8] *Prime International*, relied on by the majority, makes clear that the premature adjudication of extraterritoriality questions is unwise. It observes that "many cases present a mixed bag of both domestic and foreign components," and even when a statute

defendant does not increase his rights to an appeal" of a pretrial motion to dismiss by declining to appear. 917 F.3d at 888.

**2**

Finally, Bescond has not identified an important issue completely severable from the merits that is also, as the third requirement of the collateral order doctrine requires, "effectively unreviewable on appeal from a final judgment." *Magassouba*, 544 F.3d at 400. This "test is satisfied only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quoting *MacDonald*, 435 U.S. at 860). Bescond has identified no such right.

To be sure, as with Martirossian, Bescond's "status as a fugitive [will] become moot if [she] submits to the jurisdiction of the federal courts." *Martirossian*, 917 F.3d at 888. But as Judge Sutton recognized in *Martirossian*, this "is true for anyone unwilling to answer an indictment or arrest warrant. And yet that claim

---

does not apply extraterritorially, the law may still be violated where there is a "domestic application" of the statute. *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 113 (2020). This inquiry requires courts to "evaluate whether the domestic activity involved implicates the 'focus' of the statute," an issue that may not be apparent on the face of the indictment. *Id.*

alone has never warranted an interlocutory appeal." *Id.*; *see also id.* at 887 (noting absence of "freestanding right not to be labeled a fugitive"); *Shalhoub*, 855 F.3d at 1261–62 (rejecting argument that labelling a defendant a fugitive is sufficient to justify interlocutory appeal). The majority identifies no persuasive reason that would warrant such an appeal here.

The majority asserts that it is "Bescond's right to mount a defense [that] can be vindicated now or never." Maj. Op. at 17. But there is no due process right to challenge a fugitivity ruling without appearing in court. And Bescond's supposed due process right is very, very far from the character of those rights that the Supreme Court has recognized to merit review pursuant to the collateral order doctrine, lest they be lost forever. Compare *Abney v. United States*, 431 U.S. 651 (1977). In *Abney*, the Court permitted interlocutory appeal of an order denying a pretrial motion to dismiss an indictment on double jeopardy grounds precisely because the Double Jeopardy Clause protects "the right not to be tried twice for the same offense"—so that if a criminal defendant is not to be deprived of that right *completely*, his challenge to the indictment *must* be reviewable before a second trial takes place. *Hollywood Motor Car Co.*, 458 U.S. at 266; *see also Abney*, 431 U.S. at 662.

Simply put, the supposed due process right on which Bescond relies is not of this sort: It is "not one that must be upheld prior to trial if it is to be enjoyed at all." *Hollywood Motor Car Co.*, 458 U.S. at 270. As the Supreme Court has explained, "[i]t is always true . . . that 'there is value . . . in triumphing before trial, rather than after it.'" *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 499 (1989) (alteration in original) (quoting *MacDonald*, 435 U.S. at 860 n.7). But the Supreme Court "has declined to find the costs associated with unnecessary litigation to be enough to warrant allowing the immediate appeal of a pretrial order." *Id.*; *see also Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 431 (1985) (noting that the "possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement imposed by Congress"). Bescond may mount a defense to each and every charge against her—including the charge that she is a fugitive—simply by submitting to the jurisdiction of the district court. If Bescond is correct and the indictment alleges an impermissible extraterritorial violation of the CEA, then she can pursue that claim both in the district court and, if necessary, on appeal. Granted, disentitlement prevents Bescond from litigating her claims from a location of her choice. But the third requirement for an appealable collateral order requires more than the convenience of an early dismissal of the charges from

23

a convenient locale. Bescond has simply failed to articulate any basis on which she is entitled to an interlocutory appeal.

*       *       *

I have no doubt that the final judgment rule imposes costs on litigants who must await a final judgment to have their positions vindicated on appeal. But Congress and the Supreme Court have both told us that any benefits from immediate appellate review in individual cases are substantially outweighed by the costs of piecemeal adjudication overall, which include both delay and outright frustration of the adjudicative process. Bescond contends that in the aftermath of this Court's decision in *Prime International*, the charges against her are a clear case of prosecutorial overreach. We do not reach the merits of this contention because we lack jurisdiction to do so. But we similarly lack jurisdiction over the issue that the majority *does* reach. I fear that our decision today will prove yet again the wisdom of the Supreme Court's instruction, which the majority fails to heed, that the collateral order exception to the finality rule is to be narrowly construed, and most especially in criminal cases. Concluding that this appeal should be dismissed in its entirety, I respectfully dissent.